KELLEY *v.* EAST JORDAN CHEMICAL CO.

1. SALES—LOGS AND LOGGING—DESTRUCTION OF SUBJECT-MATTER. Under the provisions of an agreement of defendant to buy wood of plaintiffs at $2.10 a cord, and pay $1.10 in the woods after it was scaled, and $1.00 additional when it was delivered at the railroad, the defendants were liable for all wood cut, scaled, and paid for by them, although fire destroyed a part of the wood before plaintiffs delivered it at the track.

2. CONTRACTS—OFFER AND ACCEPTANCE—VOLUNTARY SERVICES. Services rendered at the expense of the vendor of wood in fighting fire to protect it, without the knowledge or direction of the vendee, are not recoverable of the latter, even though after receiving notice of the expense a written statement was rendered to the vendor showing credit for this item, but showing an erroneous balance due for money advanced to the vendor.

Error to Antrim; Mayne, J.   Submitted April 5, 1910. (Docket No. 2.)   Decided September 27, 1910.

Assumpsit by Frank L. Kelley and another against the East Jordan Chemical Company for goods sold and delivered.   A judgment for the amount of a set-off claimed by defendant on a verdict directed by the court is reviewed by plaintiffs on writ of error.   Reversed.

*Nelson C. Weter*, for appellants.

*Nicholas & Nicholas*, for appellee.

MOORE, J. This litigation grows out of a situation testified to by Mr. Kelley, one of the plaintiffs, as follows:

"The other plaintiff in the case is Mr. Shepard. We had some business relations with defendant company in 1908. We heard that they were buying wood along the line of the D. & C. R. R. I wrote to them, and in about two weeks from the time I wrote their man came to me. His name was Maddock. He came on and explained what he was there for. I told him we had 1,000 cords or better to be cut yet, a mile and half east of town, about 60 rods from track, and good banking ground there. I asked him price. He said $2.10. After he had got the location of timber, nearness to track, and there was good banking ground, I asked him specifications. He said they wanted their wood 50 inches long, as near as they could get it, and round wood, nothing less than 2 inches and nothing larger than 7 inches, larger should be split, piled in the woods 4 feet, 4 inches high, and that he would come and scale it as often as we had 100 cords, and would pay us a dollar ten a cord in the woods. When it was piled on the track, it was to be piled eight feet, eight inches high. He said: 'We will scale it, and give you a dollar a cord then.' 'Well,' I said, 'I think we will cut it on those terms. I will talk it over with Mr. Shepard, and, if we conclude to cut it, we will notify you, and we will cut it, and you can come and scale it.' So we did notify them, and they came all right and scaled it in the woods. We got our pay by a memorandum wood check, printed across bottom, 'Payable at East Jordan Bank.' I think the defendant's name was on the order. When the wood was ready I notified Mr. Maddock, the scaler. I did not notify the East Jordan Chemical Company direct at that time. The East Jordan Chemical Company was paying me. * * * The last payment that they made to us was on the 7th of September, for some wood that was at the track after the fires. We hauled some wood out after that. It was scaled, but I don't know when. I got notice of the scale made in October. It was 147¾ cords. Mr. Shepard got the notice, and made a kick on it, and they came back there and found Mr. Adams,

and he told them where there was more wood. They gave us the proper scale, which was 160¾ cords. They have not paid us for that. The last scale they paid us for, September 7th, 79½ cords, was scaled after the fire. They paid us for that.   *   *   *

" *Witness:* The $36 in the bill of particulars against the defendant company was for fighting fire in the woods to protect the wood that had been scaled in the woods. I sent them a statement charging them with the 160¾ cords at $1 per cord, and in that statement was $36 for fighting fire, $18 of which was due Mr. Shepard for himself, men, and teams for fighting fire, making $36 in all.   *   *   * We have not been paid for that 160¾ cords. We have not been paid the $36 for fighting fire."

On the cross-examination he testified among other things:

"The contract in the first instance was made at my office. No one present but Mr. Maddock and myself. The agreement was that they would scale in the woods and pay us $1.10 per cord. We did not agree to deliver the wood at railroad for $2.10 a cord.

"Q. What prices did he tell you he would pay for that wood right there in your office?

"A. When he first came, I asked the price of wood, and he said $2.10 a cord, that was supposed to be delivered at the railroad track. No, sir; we did not agree to deliver the wood. We made no subsequent contract with Mr. Maddock in regard to this wood. The one we made at my office is the only one. At my office we did not agree to cut that wood and deliver it at the railroad or at the banking ground, as you call it, for $2.10 a cord. Two dollars and ten cents was the price he said they were paying for wood.

"Q. Did you accept that price?

"A. No; not on that terms, that we should deliver it at the track for $2.10. No, sir; we did not come to a final agreement that day anyway. I mean this: That we agreed that, as soon as I could see Mr. Shepard, we would notify him, and we did notify him that there was—I suppose, if we get right down to it, the contract was made then. We sent for him to come and scale it, and that would be the final deal in it.   *   *   *   When I was discussing the matter with Mr. Maddock, it was all standing timber yet. I am not acquainted with the members of

the defendant corporation that I know of, and I made no agreement with them in regard to this wood. Mr. Maddock is the only man I had any deal with. The stumpage belonged to Mr. Shepard and me. We were partners. At the time I had talk with Mr. Maddock we were partners. I was acting for the copartnership. * * *

"*Q.* What was the agreement as to the delivery of the wood. Didn't you agree to deliver that wood at the railroad for $2.10 a cord?

"*A.* No, sir.

"*Q.* You did not agree to deliver that wood?

"*A.* No, sir; we didn't agree to deliver it.

"*Q.* Did you make any subsequent contract with Mr. Maddock in regard to this wood?

"*A.* No, sir.

"*Q.* That is the only contract you ever made, the one you made at your office?

"*A.* That is the only one.

"*Q.* And at your office you didn't agree to cut that wood and deliver it at the railroad or banking ground, as you call it, for $2.10 a cord?

"*A.* No, sir.

"*Q.* You say that he agreed to give you $2.10 for the wood?

"*A.* That is the price he said they were paying for the wood.

"*Q.* Did you accept that price?

"*A.* No; not on that terms, that we should deliver it at the track for $2.10. No, sir; we didn't come to a final agreement that day anyway. * * *

"*Q.* Then you never made any contract at your office for this wood, is that right?

"*A.* I suppose, if you get right down to it, the contract was made then. We sent for him to come and scale it, and that would be the final deal in it. * * * I never offered to sell to defendant any wood delivered at the tracks at $1. I did not offer to sell, nor did I sell, any wood to the East Jordan Chemical Company at $2.10 a cord delivered at track. I did not sell to them under that proposition; no, sir. * * * No money was advanced to us that I know anything about. The $1.10 a cord was received as part of purchase price for wood, and was paid from time to time, as we asked for the scale of wood in the woods. We were to deliver it on the track. The

wood did not have to be delivered at the track before we got any pay for it; no, sir. We got $1.10 in the woods corded up. Had to be scaled first; yes.

"*Q.* And before you could be paid, or demand your pay for the wood, it had to be delivered at the track, and had to be scaled, did it not?

"*A.* The final payment; yes, sir. No, sir; we did not have to deliver at track and have it scaled in order to determine what amount of money was coming to us. It was partly determined in the woods. The wood was on 120 acres of land. I had a number of different wood choppers at work. Mr. Maddock was only notified by us the first time to come out and scale. After that, he came out every two weeks, without notice, and would scale all that was cut and piled up at that time in woods, and stamped it. It might have been letter 'C,' but I thought it was 'O.'

"*Q.* Then, when the wood was delivered at the track, didn't he mark it with another stamp?

"*A.* Yes, sir.

"*Q.* And the wood that was stamped with the letter 'C' was a guide that assisted you in determining what wood was cut and what was not cut?

"*A.* Yes, sir. The wood after it was stamped and paid for was theirs. We had an interest in it, of course, but we could not sell it to any one else. At the time the wood was destroyed in the woods it had all been scaled.

"*Q.* And the defendant had advanced this $1.10 on each cord that had been scaled?

"*A.* They had paid us $1.10 on it; yes, sir. They paid us on that scale as soon as they could figure it up at the office. Yes, sir; it was a cash deal up till the final wind up.

"*Q.* It had been a cash deal with you up to the time when this wood was destroyed by fire. Is that right?

"*A.* Yes; they made one scale after the fire that they paid for. No; they did not pay for that scale before they knew of fire. I think 1,085¼ cords were scaled in woods, and for that we received $1.10 a cord. They paid us for 535¾ cords, at $1 a cord."

No one else testified as to the contract. The attorney for the defendant said in part in his opening statement to the jury:

"I think, gentlemen of the jury, that it will be admit-

162 Mich.—34.

ted by all hands—that is, the parties to this case, and those interested—that this fire that occurred and destroyed the wood in question was not due to the negligence or carelessness of either of the parties. I do not think there is any claim of that kind made by either of the parties. The plaintiffs do not claim it, and we do not either."

There was some testimony as to fighting the fire, and the cost thereof, and of the circumstances of the $79 payment made after the fire. At the conclusion of the testimony, the judge suggested there was no question for the jury, to which suggestion the lawyers acquiesced except as to the item for fighting the fire. Later the judge directed a verdict in favor of defendant for $233.47. In Exhibit A there was a credit for the item in relation to fighting fire, but there was a claim of balance due defendant of $233.47. The case is brought here by writ of error.

It was and is the claim of defendant that the contract was an entirety for the sale and purchase of all the wood to be delivered at the railroad tracks at $2.10 a cord, and that defendant should be charged only with the amount of wood actually delivered, and should be credited with all moneys paid upon the scale in the woods so that all the loss from the destruction of the wood should fall upon the plaintiffs. This view was accepted by the trial judge. It is the claim of the plaintiffs that the agreement should be carried out as made; that when the wood was cut and piled and scaled and marked with the letter ' C ' in the woods, and the $1.10 a cord was paid, that this money became the money of the plaintiffs because it was so agreed. It is further claimed that, when the wood was later drawn to the railroad and scaled, plaintiffs were then entitled to the further sum of $1 a cord because it was so agreed. It is further claimed that, as none of the parties anticipated forest fires and made no agreements in relation thereto, the parties should be left where the fire left them, the plaintiffs losing their interest in the wood which was destroyed by the fire, and the defendant losing the pay-

ments which had been made according to agreement when the scale in the woods was made. The agreement sworn to by Mr. Kelley is not ambiguous. It is not denied by any witness upon the stand. No testimony was offered by defendant as to that phase of the case. The agreement must control the case. Defendant should have paid for the 160 cords delivered at the railroad track.

The item of $36 for fighting the fire demands some attention. This expense was not incurred at the request of the defendant. It is said by plaintiffs that, when notified of the expense, defendant credited plaintiffs with the amount thereof, and thereby became liable to pay. This contention loses its force when it is stated that this credit appeared in a statement charging plaintiffs with all payments made and crediting them, in addition to the $36, with only the wood delivered upon the railroad, which statement claimed a balance due defendant of $233.47. We think this does not establish a liability for the $36 item.

Judgment is reversed, and a new trial ordered.

McALVAY, BROOKE, BLAIR, and STONE, JJ., concurred.